IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAMELA J. GREEN, | ) | CASE NO. 1:14-cv-00358 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Pamela J. Green ("Plaintiff" or "Green") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 16.   As explained more fully below, the

Administrative Law Judge ("ALJ") failed to comply with the treating physician rule when

evaluating the opinions of two of Green's treating physicians.  Accordingly, the Court

**REVERSES AND REMANDS** the final decision of the Commissioner for further proceedings

consistent with this Opinion.

### I.  Procedural History

On May 14, 2010, Green protectively filed applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").[1]  10, 64-66, 127-130, 178.   Green alleged a

disability onset date of December 1, 2009.  Tr. 10, 127, 178.  She alleged disability based on

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 2/25/2015).

rheumatoid arthritis, degenerative disc disease of her cervical and lumbar spine, herniated disc (4 cervical area and 3 lumbar area), neuroforaminal stenosis, hypertension, fibromyalgia and depression.  Tr. 67, 73, 163.    After initial denial by the state agency (Tr. 67-71), and denial upon reconsideration (Tr. 73-75), Green requested a hearing (Tr. 80).  On July 27, 2012, ALJ Ben Barnett conducted an administrative hearing.  Tr. 27-63.

In his August 21, 2012, decision, the ALJ determined that Green had not been under a disability from December 1, 2009, through the date of the decision. Tr. 7-26.  Green requested review of the ALJ's decision by the Appeals Council.  Tr.  5-6.  On December 20, 2013, the Appeals Council denied Green's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.    Personal, educational and vocational evidence

Green was born in 1960.  Tr. 127.  She was 52 years old at the time of the hearing.  Tr. 40.  She is five feet tall and weighs about 275 pounds.  Tr. 44.  Green completed a licensed practical nurse program in 1979.  Tr. 172.   She worked as a nurse for 30 years, including home health care work.  Tr. 41, 48, 58-59.  She last worked in 2010.  Tr. 48.  According to Green, at the time she stopped working she was doing home health care and constantly getting in and out of the car was bothering her.  Tr. 48.  Also, she was concerned that if she went to one of her patient's homes and found the patient passed out she would not be able to help him/her or resuscitate him/her.  Tr. 48.

### B.    Medical evidence

#### 1.  Treatment history

Green saw various medical providers, including Dr. Richard Cole, D.O., as her primary care physician; Dr. Sanjay Kumar, D.O., for her back problems; Dr. Dhruv Patel, M.D., for her fibromyalgia; and Dr. Robert S. Perhala, M.D., for her rheumatoid arthritis.  Tr. 191-192.

### ***Dr. Richard Cole, D.O.***

On May 7, 2010, Green saw Dr. Cole to establish a new primary care physician.   Tr. 267. Green was seeking a second opinion regarding her current medication.  Tr. 267.  Green had recently been diagnosed with rheumatoid arthritis and fibromyalgia.  Tr. 267.  Green was still working at the time of her initial visit with Dr. Cole.  Tr. 267.  She reported that she was constantly tired, especially in the afternoon.  Tr. 267.  She also reported that it took her about 1 ½ hours every morning to start moving around.  Tr. 267.  On physical examination, Dr. Cole noted signs of myalgia and arthralgia.  Tr. 267.  Dr. Cole continued her medication and recommended follow-up in one to two months.  Tr. 267.

Following a visit to the emergency room for sharp, stabbing pain to her right shoulder/back, Green saw Dr. Cole on June 23, 2010.  Tr. 251, 264.  Dr. Cole's diagnoses included right radiculitis thoracic, rheumatoid arthritis, and fibromyalgia.  Tr. 264.  Dr. Cole adjusted Green's medications. Tr. 264.   A month later, on July 14, 2010, Dr. Cole noted that Green's radiculitis was resolving.  Tr. 263.

In July 2011, Green saw Dr. Cole for a three month follow-up and refill on most of her medications.  Tr. 686-692.  Green indicated that she had fallen while getting out of a pool the prior month and she had injured her right leg and left shoulder.  Tr. 686.  She reported taking three Percocets daily.  Tr. 686.  On physical examination, Green showed normal sensation, reflexes, coordination, muscle strength and tone.  Tr. 690.  She was alert and cooperative and her mood and affect and attention span and concentration were normal.  Tr. 690.  In September 2011,

Green saw Dr. Cole with complaints of pitting edema in her feet, having a severe pounding headache, and feeling very fatigued.  Tr. 802.   She also complained of sinus congestion and a sore throat.  Tr. 802.  Dr. Cole prescribed Lasix for swelling and directed her to discontinue another medication because of the edema.  Tr. 806.   Green saw Dr. Cole in December 2011 for follow up and complained of having headaches off and on for about two weeks.  Tr. 790.  She reported that she was seeing Dr. Perhala for her arthritis and taking steroids for that condition.  Tr. 790.  On examination, Dr. Cole noted that Green was alert and cooperative and her mood and affect and attention span and concentration were normal.  Tr. 793.  Dr. Cole noted that Green showed "rheumatoid changes" in her extremities.  Tr. 793.  Neurologically, Green was "grossly intact."  Tr. 793.  Dr. Cole advised Green to follow up with rheumatology, lose weight, monitor her blood sugars, take medication as directed and follow up with him in three months.  Tr. 795.

In March 2012, Green followed up with Dr. Cole regarding her hypertension and diabetes.  Tr. 823.  On examination, Dr. Cole noted that Green was neurologically intact.  Tr. 825.  Green was alert and cooperative and her mood and affect and attention span and concentration were normal.  Tr. 825.  At that time, Green was contemplating gastric bypass surgery.  Tr. 826.  During a May 30, 2012, visit with Dr. Cole, Green complained of anxiety and depression.  Tr. 870.  On examination, Green was alert and cooperative and her mood and affect and attention span and concentration were normal.  873.  Dr. Cole noted that Green was "grossly intact" neurologically.  Tr. 873.  Among his recommendations, Dr. Cole recommended a sleep study.  Tr. 876.

On July 18, 2012, Green saw Dr. Cole for follow up and to discuss the results of a sleep study done that month that showed Green had severe sleep apnea.  Tr. 896, 899.  Green reported still being very fatigued and having significant daytime somnolence.  Tr. 896.  On examination,

Green showed joint tenderness and swelling with decreased range of motion.  Tr. 898.  She was intact neurologically.  Tr. 898.  She was alert and cooperative and her mood and affect and attention span and concentration were normal.  Tr. 898.

### Dr. Robert S. Perhala, M.D.

On January 14, 2010, Green saw Dr. Perhala for follow up regarding her osteoarthritis and newly diagnosed rheumatoid arthritis.  Tr. 391.  Green reported that her rheumatoid arthritis had been under fair control.  Tr. 391.  She was having good effects from the Plaquenil therapy without significant side effects.  Tr. 391.  However, she was having some stiffness and pain in her hands, wrists, shoulders, knees and feet.  Tr. 391.  She had had a flare up in her left ring finger.  Tr. 391.  Also, her back remained "quite painful."  Tr. 391.  Most other joints remained stable and there were no radiating joint symptoms.  Tr. 391.  Green expressed a mild degree of fatigue.  Tr. 391.  She noted no exacerbating issues with her arthritis.  Tr. 391.  Green reported anxiety, depression and sleep pattern disturbance.  Tr. 391.  Her physical examination generally showed normal range of motion throughout her body.  Tr. 392.  Green had some tenderness in her spine, shoulders, thumbs and left knee.  Tr. 392.  Green walked with a slightly antalgic gait. Tr. 392.  Dr. Perhala noted 6 out of 18 fibromyalgia tender points.  Tr. 393.  Green's motor strength and reflexes were normal.  Tr. 393.  Green's mood was normal.  Tr. 393.  Dr. Perhala's diagnoses included rheumatoid arthritis, osteoarthritis (generalized multiple sites), and spinal stenosis lumbar region.  Tr. 394.  Dr. Perhala recommended that Green start a water program. Tr. 394.  Green's Health Assessment Questionnaire scores were: HAQ score: moderate; fatigue score: moderate high; pain score: moderate; and global score: moderate.[2] Tr. 394.

---

[2] In his treatment notes, Dr. Perhala referenced "Health Assessment Questionnaire" scores, including an HAQ score, fatigue score, pain score and global score.  It is unclear whether this was a subjective or objective test.

A few months later, on April 15, 2010, Green saw Dr. Perhala again.  Tr. 395.  Her rheumatoid arthritis remained under fair control.  Tr. 395.  Green continued to report stiffness and pain in her hands, wrists, shoulder, knees and feet and pain in her back.  Tr. 395.  Dr. Perhala recommended a water program for her back.  Tr. 395.  Dr. Perhala noted that Dr. Patel was of the opinion that Green had fibromyalgia and was starting Green on Savella.  Tr. 395.  Green's range of motion, strength, and reflexes were again generally normal.  Tr. 397.  Dr. Perhala again noted 6 out of 18 fibromyalgia tender points.  Tr. 397.  Green continued to walk with a slightly antalgic gait.  Tr. 396.  Green's Health Assessment Questionnaire scores were: HAQ score: moderate; fatigue score: high; pain score: high; and global score: moderate high. Tr. 398.

During a May 27, 2010, visit with Dr. Perhala, it was noted that Green's rheumatoid arthritis had been under fair control.  Tr. 400.  She was continuing with Plaquenil and having good effects with the arthritis without significant side effects.  Tr.  400.  Green continued to report some stiffness in her hands, wrists, shoulders, knees and feet.  Tr. 400.  Because of her back pain, Dr. Perhala again recommended a water program.  Tr. 400.  There were no radiating joint symptoms.  Tr.  400.  Green expressed a mild degree of fatigue.  Tr. 400.  Green continued to report anxiety, depression and sleep pattern disturbance.  Tr. 401.  Green's Health Assessment Questionnaire scores were: HAQ score: moderate; fatigue score: high; pain score: moderate; and global score: moderate high.  Tr. 403.

During a September 9, 2010, visit with Dr. Perhala, it was noted that Green's rheumatoid arthritis remained under fair control.  Tr. 405.  Green was continuing with the Plaquinil with good effects.  Tr. 405.  Initially, Green had not had significant side effects but started to have GI problems so her dosage was changed.  Tr. 405.  Green had developed a problem with her cervical spine and bulging/herniated discs.  Tr. 405.  She was under Dr. Kumar's care for those issues.

Tr. 405.  Green continued to report a mild degree of fatigue.  Tr. 405.  Dr. Patel was continuing

to treat Green for fibromyalgia.  Tr. 405.  Green continued to walk with a slightly antalgic gait.

Tr. 406.  Her range of motion, strength, and reflexes were again generally normal.  Tr. 406-407.

Green's Health Assessment Questionnaire scores were: HAQ score: moderate; fatigue score:

high; pain score: moderate high; and global score: high.  Tr. 408.

On November 9, 2010, Green's rheumatoid arthritis remained under fair control.  Tr. 631.

Dr. Perhala noted that Green had recently experienced left arm weakness, which another

physician, Dr. Patel, felt was related to a virus.  Tr. 631.  Green's left arm was getting better.  Tr.

631.  Green reported a moderate to severe degree of pain, which seemed to be getting worse.  Tr.

631.  Green's fibromyalgia was still being treated with Savella, which was helping.  Tr. 631.

Green continued to report anxiety, depression and sleep pattern disturbance.  Tr. 632.  She

continued to walk with a slightly antalgic gait.  Tr. 632.  Green's Health Assessment

Questionnaire scores were: HAQ score: modest; fatigue score: high; pain score: moderate; and

global score: moderate high.  Tr. 634.

In April 2011, Dr. Perhala ordered hand and knee x-rays.  Tr. 660-663.  The x-rays

showed mild osteoarthritis in Green's hands and severe osteoarthritis in her knees.  Tr. 660-663,

699.  Dr. Perhala recommended physical therapy for Green's knees.  Tr. 699.  He provided

Green with a DepoMedrol pack for arthritis flare-ups and noted that, if the DepoMedrol pack did

not help with her knee pain, she may want to consider an injection.  Tr. 699.

On July 12, 2011, Green saw Dr. Perhala for follow up.  Tr. 616.  Green's rheumatoid

arthritis remained under fair control.  Tr. 616.  Dr. Perhala noted that Green had recently fallen

on a swimming pool ladder.  Tr. 616.  Green had proceeded with physical therapy for her knees.

Tr. 616.  The physical therapy had helped at the time but Green was experiencing some residual

pain.  Tr. 616.  Green's fatigue was moderate to severe and seemed to be getting worse.  Tr. 616.
Dr. Patel was continuing to treat Green for her fibromyalgia and he was co-managing Green's
arm pain.  Tr. 616.   Green's Health Assessment Questionnaire scores were: HAQ score:
moderate; fatigue score: moderate; pain score: moderate high; and global score: moderate Tr.
619.  Dr. Perhala noted that they would reassess Green's return to physical therapy once she was
able to and they would consider joint injections as needed.  Tr. 620.

On March 5, 2012, Green saw Dr. Perhala.  Tr. 810.  Her rheumatoid arthritis remained
under fair control.  Tr. 810.  There was some degree of stiffness in her hands, wrists, shoulders,
knees and feet.  Tr. 810.  Green's hips and heels had been flaring up over the prior week.  Tr.
810.  Most other joints were stable.  Tr. 810.  She had undergone another caudal block through
Dr. Kumar for her cervical spine issues.  Tr. 810.  The caudal block had helped but Green had
had the flu and was coughing, which aggravated her cervical spine again. Tr. 810.  Green had a
moderate degree of fatigue.  Tr. 810.  There were no radiating joint symptoms.  Tr. 810.  Green
was considering bariatric surgery.  Tr. 810.  Green continued to report anxiety, depression and
sleep pattern disturbance.  Tr. 811.  Green continued to walk with a slightly antalgic gait.  Tr.
811.  Her range of motion, strength, and reflexes remained generally normal and Dr. Perhala
continued to note 8 out of 16 fibromyalgia tender points.  Tr. 811-812.  Dr. Perhala noted that
Green's mood and affect were normal.  Tr. 812.  Green's Health Assessment Questionnaire
scores were: HAQ score: high; fatigue score: high; pain score: high; and global score: high.  Tr.
813.  Dr. Perhala noted that Green's HAQ score was high and significantly worse.  Tr. 814.   Dr.
Perhala and Green again discussed bariatric surgery.  Tr. 814.  Dr. Perhala ordered x-rays of
Green's wrists and hands and he ordered lab work.  Tr. 814.

On June 5, 2012, Green saw Dr. Perhala for follow up.  Tr. 862.  Her rheumatoid arthritis remained under fair control.  Tr. 862.  Green was continuing to get good results from her medications without significant side effects.  Tr. 862.  Green continued to have some degree of stiffness and pain in her hands, wrists, shoulders, knees and feet.  Tr. 862.  Green's hips and heels had been active.  Tr. 862.  Most other joints were stable.  Tr. 862.  Dr. Kumar's recent caudal blocks for Green's cervical spine issues had been helpful.  Tr. 862.  There were no radiating joint symptoms.  Tr. 862.  Green had a moderate degree of fatigue.  Tr. 862.  Dr. Patel was continuing to treat Green for fibromyalgia with Savella.  Tr. 862.  Green continued to report anxiety, depression and sleep pattern disturbances.  Tr. 863.  Dr. Perhala continued to observe that Green walked with a slightly antalgic gait.  Tr. 863.  Her range of motion, strength, and reflexes remained generally normal and Dr. Perhala continued to note 8 out of 16 fibromyalgia tender points.  Tr. 863-864.  Dr. Perhala noted that Green's mood and affect were normal.  Tr. 864.  Green's Health Assessment Questionnaire scores were: HAQ score: high; fatigue score: high; pain score: high; and global score: high.  Tr. 865.  Green's labs from the prior visit were normal.  Tr. 865.  Her wrist x-rays were normal.  Tr. 865.  An x-ray of her left hand and an x-ray of her hands bilaterally were abnormal showing some degenerative changes.  Tr. 865.  Dr. Perhala discussed the x-ray results with Green and advised that the results were stable as compared to prior results.  Tr. 866.  Due to insurance coverage issues, Green had decided to postpone bariatric surgery.  Tr. 866.

### *Dr. Dhruv Patel, M.D.*

On May 27, 2009,[3] Green saw Dr. Patel of the Neurology Center, Inc. for abnormal MRI results and headaches at the request for Dr. Stevens.[4]  Tr. 321.  Green also reported numbness

---

[3] Dr. Patel noted that Green was last seen by the Neurology Center, Inc. in July 2008 for cervicalgia.  Tr. 321.

and tingling in her right arm and hand and low back pain.  Tr. 321.  Dr. Patel noted that Green

had had recurrent facial palsy on three different occasions in the past.  Tr. 321.  However, she

had not had any residuals except for some occasional pain on the left side of her face.  Tr. 321.

She continued to have significant neck pain.  Tr. 321.  Dr. Patel noted that the headaches Green

described appeared to be pressure headaches in the top of her head.  Tr. 321.  Because of Green's

neck pain, Dr. Patel noted that it was difficult to determine whether the headaches were related to

her neck.  Tr. 321. Dr. Patel's physical examination revealed no pronator drift of Green's upper

extremities; her fine finger movement was symmetrical; strength in her upper extremities was

5/5 in the muscle groups tested; her reflexes were 2+ in the upper and lower extremities; her

shoulder shrug was normal; Green was able to stand from sitting position without support; her

gait and stance were normal; and her sensory examination was normal.  Tr. 323.  Dr. Patel

concluded that Green's recent MRIs showed two lesions that were white matter but noted that

Green did not have symptoms of demyelination as seen with multiple sclerosis.  Tr.  323-324.

Dr. Patel was not certain whether Green's headaches were vascular headaches or related to her

underlying cervical canal stenosis.  Tr. 324.  He recommended a trial of Topamax to see if it

helped.  Tr. 324.  Dr. Patel noted that Green's evaluation appeared to be of moderate to high

complexity due to the findings of her MRI and multiple other symptoms.  Tr. 324.

Green saw Dr. Patel on July 29, 2009.  Tr. 318.  Green reported that her headaches were

uncontrolled and she was having five headaches per week.  Tr. 318.  She reported back pain and

feeling as though she was in a fog.  Tr. 318.  Dr. Patel recommended a change in Green's

medication and noted that the primary course of treatment would likely be physical therapy, heat,

ice treatments, and anti-inflammatory muscle relaxants.  Tr. 320.

---

[4] Prior to Dr. Cole, Dr. Stevens was Green's primary care physician.  Tr. 709-757.

Green saw Dr. Patel on December 9, 2009, with complaints that her pain had not improved and she was having more spasms.  Tr. 315.  Her headaches, however, were much better.  Tr. 315.  Dr. Patel again noted that he did not think that Green's MRI was suggestive of demyelination as seen in multiple sclerosis.  Tr. 317.  He recommended increases in her medication and a possible repeat EMG because Green was continuing to complain of numbness.  Tr. 317.

On January 20, 2010, Green saw Dr. Patel earlier than scheduled because of three uncontrolled headaches at night during the prior week.  Tr. 311, 313.  Green reported that her pain had not improved.  Tr. 311.  Green also reported that she continued to have myalgic pain and numbness and tingling in the upper extremities.  Tr. 311.  Dr. Patel recommended that Green proceed with an EMG and he also started her on a new medication.  Tr. 313.  Dr. Patel noted that, since Green's last evaluation, she had been diagnosed with rheumatoid arthritis for which she was seeing Dr. Perhala.  Tr. 313.  Physical examination findings were normal.  Tr. 313.  Green was able to stand from a sitting position without support.  Tr. 313.  Her gait and stance were normal.  Tr. 313.

On February 24, 2010, Green underwent an electromyogram performed by Dr. Patel.  Tr. 295.  The EMG showed moderate left median nerve neuropathy at the wrist as seen in carpal tunnel syndrome; mild right median nerve neuropathy at the wrist as seen in carpal tunnel syndrome; and minor C6 radicular change on the right without any active nerve degeneration.  Tr. 295.

On April 14, 2010, Green saw Dr. Patel complaining of uncontrolled nighttime headaches, which Green believed were sinus headaches.  Tr. 302.  Green had multiple aches and pains.  Tr. 302.  She complained of worsening pain, especially in her legs.  Tr. 302.  She also

complained of increased fatigue.  Tr. 302.  She also reported that she had a facial droop and left Bell's palsy that had not improved.  Tr. 302.  She continued to have spasms but she was responding well to medication.  Tr. 302.  Physical examination findings were normal.  Tr. 304. Dr. Patel concluded that Green's multiple pain symptoms were consistent with fibromyalgia.  Tr. 304.  Dr. Patel noted multiple tender points.  Tr. 304.  He recommended that Green be treated for fibromyalgia and that she start on Savella.  Tr. 304.  Dr. Patel noted that Green had lumbar radiculopathies for which surgery was recommended.  Tr. 304.  However, Green had not proceeded with surgery.  Tr. 304.  Dr. Patel also noted that Green showed signs of moderate carpal tunnel syndrome on the left but Green did not think that she was symptomatic and was not interested in surgical intervention at the time.  Tr. 304.

During an August 11, 2010, appointment with Dr. Patel, Green complained that her neck pain was radiating into her left arm.  Tr. 325.  Green had been biking riding, which Dr. Patel noted may have triggered Green's pain.  Tr. 325.  Dr. Patel noted that Dr. Kumar was attempting to have an MRI approved for Green's neck.  Tr. 325.  Green's fibromyalgia had improved with Savella.  Tr. 325.  Green was not complaining of headaches.  Tr. 325.  Physical examination findings were generally normal with the exception of "significant tightness of the trapezius muscle mostly on the left above the scapula."  Tr. 327.  Dr. Patel noted that that area appeared to be knotted.  Tr. 327.  Dr. Patel again concluded that Green's multiple symptoms in multiple areas were likely fibromyalgia and he recommended that Green continue with Savella.  Tr. 327.  With respect to the pain in her neck, Dr. Patel noted that they were awaiting an MRI of the cervical spine.  Tr. 327.  He noted that Green had not proceeded with surgical intervention for her lumbar radiculopathies.  Tr. 327.

On September 22, 2010, Green saw Dr. Patel for a second opinion regarding spinal surgery due to significant weakness in her arm.  Tr. 436.  Green had been seen by Dr. Kumar and Dr. Sertich[5] for her cervical problems.  Tr. 436.  Dr. Patel noted that the cervical MRI showed findings of C5-C6 radiculopathies.  Tr. 436.  Dr. Patel noted that Green's symptoms had started with flu-like symptoms.  Tr. 436.  Green had continued to show improvement over the prior two weeks and was now able to raise her arm up and the pain was not as bad.  Tr. 436.  Also, Green's flu-like symptoms had started to improve.  Tr. 436.  On physical examination, Dr. Patel found that, although Green had weakness with shoulder abduction on the left, she had no notable pain except for tenderness that she had had in the past and all of her reflexes were present.[6]  Tr. 438. Dr. Patel diagnosed brachial plexopathy on the left, which he concluded was unrelated to her underlying cervical pathology.  Tr. 438.  Dr. Patel noted his concern over Green proceeding with surgical intervention while she was being treated for brachial plexopathy and, unless Green showed additional symptoms, Dr. Patel recommended that she hold off on surgical intervention. Tr. 438.  Dr. Patel noted that Green's fibromyalgia was well controlled.  Tr. 438.

On November 15, 2010, Green saw Dr. Patel for follow up regarding her cervical radiculopathy.  Tr. 432.  Dr. Patel noted that Green had attended physical therapy once.  Tr. 432. She had developed a migraine, which Green attributed to therapy.  Tr. 432.  Green was still having some numbness in her right arm.  Tr. 432.  Green was getting over mononucleosis and reported feeling somewhat tired.  Tr. 432.  Physical examination findings were generally normal. Tr. 434.  Dr. Patel noted that Green had recovered all her reflexes.  Tr. 434.  She had very minimal weaknesses in her right hand.  Tr. 434.  Dr. Patel concluded that Green's brachial

---

[5] Dr. Sertich was affiliated with Dr. Kumar and NeuroSpineCare, Inc.  Tr. 512.

[6] Dr. Patel noted that, when Green had recently been seen by Dr. Kumar and Dr. Sertich, Green's reflexes were not intact.  Tr. 436. *See also* Tr. 483 (Dr. Sertich's September 16, 2010, treatment notes indicating that Green's "[r]eflexes show absent triceps tendon reflex"); Tr. 484 (Dr. Kumar's September 8, 2010, treatment notes indicating that Green's reflexes in the left triceps were diminished).

plexopathy on the left was continuing to improve. Tr. 434. Because of the minor weakness in her right hand, Dr. Patel recommended that Green aggressively continue with physical therapy. Tr. 434. Dr. Patel did not believe that Green's migraine headache was related to therapy. Tr. 434. With respect to Green's cervical issues, Dr. Patel was not recommending surgical intervention at the time. Tr. 434. He noted that Green's fibromyalgia was well controlled. Tr. 434.

Green next saw Dr. Patel on March 30, 2011. Tr. 609. Dr. Patel noted that Green was doing quite well. Tr. 609. Since her November 2010 evaluation, Green had not had any further worsening. Tr. 609. During the visit, Green complained of dizziness and reported having a headache. Tr. 609. Physical examination findings were normal. Tr. 611. Dr. Patel found that Green's brachial plexopathy on the right had completely improved. Tr. 611. Green had other neurological syndromes, including fibromyalgia for which Green was taking Savella. Tr. 611. Green was also taking Percocet. Tr. 611. Dr. Patel noted that Green also had arthritis of a rheumatoid origin, which complicated the matter. Tr. 611.

On September 14, 2011, Green saw Dr. Patel for follow up regarding her fibromyalgia and dizziness. Tr. 758. Green reported not doing well. Tr. 758. She indicated that her dizziness was bad. Tr. 758. She was having a lot of pain in the right chest area. Tr. 758. She was not feeling up to doing anything. Tr. 758. She was weepy. Tr. 758. Green was under considerable stress, she was not sleeping well, and she complained of increased depression. Tr. 758. Dr. Patel concluded that Green's chest pain was related to her underlying arthritis and fibromyalgia. Tr. 761. Dr. Patel recommended no changes to Green's medication, noting that Green would continue with Percocet and Savella. Tr. 761. Dr. Patel also noted that Green had occasional headaches, which had not recurred. Tr. 761. Dr. Patel recommended Antivert for her dizziness

14

and referred her for an exercise program.  Tr. 761.  Dr. Patel indicated that Green's significant stress was causing her fibromyalgia to flare up.  Tr. 761.  Dr. Patel recommended an increase in Green's Celexa.  Tr. 761.

On March 30, 2012, Green saw Dr. Patel.  Tr. 837.  Dr. Patel noted that he had not seen Green for six months.  Tr. 837.  Green reported that her fibromyalgia and dizziness were about the same.  Tr. 837.  Green reported that she was continuing to have significant pain in her wrists and arms.  Tr. 837.  Green reported very occasional dizzy spells and a very occasional headache. Tr. 837.  She had two to three dizzy spells since Dr. Patel last saw her six months before.  Tr. 840.  She was continuing to take the Antivert and Celexa.  Tr. 837.  Dr. Patel noted that Green had sleep apnea but had not been using her C-PAP machine.  Tr. 837.  Green indicated that she was going to be reevaluated.  Tr. 837.  On physical examination, Dr. Patel noted a few tender points.  Tr. 839.  He indicated it was likely that the tenderness was tendinitis rather than fibromyalgia.  Tr. 839.  Dr. Patel prescribed Ultram for pain, as needed.  Tr. 840.

### *Dr. Sanjay Kumar, D.O.*

In October 2008, Green began seeing pain management specialist Dr. Kumar for treatment of her cervical issues.  Tr. 743.  On May 1, 2009, Green reported getting some relief from bilateral L4-L5, L5-S1 facet joint injections.  Tr. 522.  She reported that her left side felt great for two weeks.  Tr. 522.  The injections helped the right side less.  Tr. 522.  Dr. Kumar planned to proceed with lumbar medical branch blocks with lidocaine.  Tr. 522.  He felt that Green might be a candidate for radiofrequency ablation due to the lack of response to the facet injections on the right side.  Tr. 522.

On May 12, 2009, Dr. Kumar performed lumbar medial branch blocks with lidocaine for diagnostic purposes.  Tr. 520.  Green tolerated the procedure well.  Tr. 520.  However, the

following day, she reported that her back was still hurting pretty bad and her legs felt heavy and her feet were numb.  Tr. 519.  Green declined further injections at that time.  Tr. 519.

On June 2, 2009, Green was still reporting low back pain and a heavy feeling in her legs. Tr. 518.  Dr. Kumar assessed low back pain, degenerative disk and joint disease with a focus at the L2-L3.  Tr. 518.  Dr. Kumar recommended bilateral epidural injections at the L2-L3 level, noting that a surgical referral might be needed if Green's pain did not get better.  Tr. 518. Following injections, in September 2009, Green reported that she had not had any relief.  Tr. 515.  Thereafter, Dr. Kumar recommended that Green see Dr. Mario M. Sertich, M.D.  Tr. 514. On October 13, 2009, Green saw Dr. Sertich.  Tr. 512.  He concluded that Green had chronic degenerative changes at L2-L3 with mild stenosis at that level.  Tr. 512.  Dr. Sertich also concluded that Green had disk disease at L3-L4 and L4-L5.  Tr. 512.  He discussed options with Green and felt that a procedure to stabilize the L2-L3 area might be reasonable but he wanted to obtain a bone density study first.  Tr. 512.  A bone density study showed normal bone density. Tr. 509.

On November 5, 2009, Green saw Dr. Kumar.  Tr. 509.  Green was still working home health care at the time.  Tr. 509.  With pain medication, her pain was about a 5 or 6 out of 10. Tr. 509.  She was taking Percocet at night and Vicodin in the morning.  Tr. 509.  She reported spasms below her right knee and that prolonged walking, standing and lying bothered her.  Tr. 509.  Sitting was better and heating pads helped.  Tr. 509.  Any strenuous activity lasting over an hour bothered her.  Tr. 509.  They discussed Dr. Sertich's recommendation. T r. 509.  Green indicated she would think about the procedure but did not want back surgery.  Tr. 509.  Dr. Kumar continued her prescriptions.  Tr. 509.  Green wanted to hold off on injections and was going to think about surgery.  Tr. 509.

On January 8, 2010, Green saw Dr. Kumar again.  Tr. 506.  She reported that her pain was affecting her quality of life and she thought that things were getting worse.  Tr. 506.  She reported that she had developed some numbness in her left hand.  Tr. 506.  On physical examination, Dr. Kumar observed that strength was functional in the lower and upper extremities; there was some tenderness in the lumbosacral junction; extension bothered her more than flexion; no swelling was seen; and gait, coordination and balance were normal.  Tr. 506.  Dr. Kumar continued her pain medication.  Tr. 506.  He recommended a water aerobics class.  Tr. 506.  He directed her to call for injections if the pain got worse.  Tr. 506.  He wrote her a handicap parking placard.  Tr. 506.  Green wanted to hold off on seeing Dr. Sertich regarding surgery.  Tr. 506.

On February 18, 2010, Green saw Dr. Kumar and reported that her pain was on average a 3 to 5 out of 10.  Tr. 504.  Her pain was worse with walking.  Tr. 504.  Her pain was fairly constant.  Tr. 504.  Medicine helped her function.  Tr. 504.  Green had not started water aerobics.  Tr. 504.  She was not interested in surgery and they decided to hold off on injections.  Tr. 504.  Dr. Kumar continued her pain medications.  Tr. 504.

On March 17, 2010, Green saw Dr. Kumar and reported that the prior week had been really bad.  Tr. 501.  She was taking two to three Vicodin during the day and Percocet at night.  Tr. 501.  Her pain was worse in the mornings.  Tr. 501.  Her flare up had subsided.  Tr. 501.  Dr. Kumar observed mild tenderness in the lower lumbar paraspinal muscles.  Tr. 501.  Green's gait, coordination and balance were normal.  Tr. 501.  Her hamstrings were mildly tight.  Tr.501.  Her flexion and extension were limited to about 75%.  Tr. 501.  Dr. Kumar continued Green's pain medication and recommended that she call for injections, if necessary.  Tr. 501.

When Green saw Dr. Kumar on May 26, 2010, Green reported that she had a decent month.  Tr. 495.  She had tried to be more active.  Tr. 495.  She had pain with walking, bending, uneven steps, and in the morning.  Tr. 495.  Green reported that things were feeling better.  Tr. 495.  She was taking medication for her fibromyalgia and joint pain.  Tr. 495.  Dr. Kumar noted that he felt Green was "fairly stable."  Tr. 495.  He continued her pain medication and recommended that she continue with her home exercise program and that she try to get into the pool.  Tr. 495.

At the end of June 2010, Green saw Dr. Kumar following a flare up of pain in her right shoulder.  Tr. 493.  She had sought treatment at the emergency room.  Tr. 493.  With respect to her  shoulder pain, Dr. Kumar assessed right sided thoracic pain, likely a sprain.  Tr. 493.  He noted that he would monitor her symptoms and recommended that she take it easy as tolerated.  Tr. 493.

On August 11, 2010, Green saw Dr. Kumar and reported that her neck and left arm were bothering her more than her back.  Tr. 491.  Dr. Kumar recommended a cervical MRI to evaluate for herniated disk or stenosis.  Tr. 491.  On August 25, 2010, Green had a cervical epidural.  Tr. 484.  She had about three days of relief and then the pain returned.  Tr. 484.  A cervical MRI was performed (Tr. 333), which Dr. Kumar indicated showed degenerative changes with bulging at C5-6, C6-7, slightly more to the left with some spinal canal stenosis at C5-6, C6-7 and probable foraminal narrowing on the left at C5-6 (Tr. 484).  On September 10, 2010, Green reported right side neck and arm pain similar to how her left arm had been feeling.  Tr. 487.  During September 2010 appointments, Dr. Kumar and Dr. Sertich noted problems with Green's triceps reflex.  Tr. 483, 484.  On September 16, 2010, Dr. Sertich concluded that he felt Green clearly had a reversal of the cervical lordotic curve and some chronic neck disease, as well as more acute C7

18

radiculopathy.  Tr. 483.  As a result, he recommended anterior cervical discectomy and fusion.
Tr. 483.  Green indicated a desire to proceed with the surgery.  Tr. 483.  Following the
discussions regarding surgery, Green saw Dr. Patel who noticed that Green's reflex was
preserved and Dr. Patel felt that she had a viral syndrome of her brachial plexus.  Tr. 482.  Dr.
Kumar agreed that things had improved with respect to the numbness in her arm and Green
cancelled her surgery with Dr. Sertich.  Tr. 482.  Green was still having low back pain with
standing and bending.  Tr. 482.

In November and December 2010, Green saw Dr. Kumar and reported increased pain in
her low back.  Tr. 479, 481. She reported that she was going to start therapy ordered by Dr. Patel.
Tr. 481.  Dr. Kumar continued her pain medication and noted that she might need lumbar facet
injections.  Tr. 479, 481.

On March 1, 2011, Green saw Dr. Kumar.  Tr. 584.  She reported an increase in pain in
her left low back and hip area.  Tr. 584.  Bending and activity bother her.  Tr. 584.  She was
taking Percocet two to three times per day.  Tr. 584.  Cold weather made her pain worse.  Tr.
584.  The Jacuzzi helped.  Tr. 584.  Sitting and lying also made her pain better.  Tr. 584.  The
pain was continuing to affect her quality of life.  Tr. 584.  Dr. Kumar recommended lumbar facet
joint injections at L3-L4, L4-L5, and L5-S1.  Tr. 584.  He also recommended that Green
continue with her home exercise program.  Tr. 584.  The injections were administered on March
14, 2011.  Tr. 595.

On May 4, 2011, Green saw Dr. Kumar and he noted that the facet injections had helped
quite a bit but the pain was coming back.  Tr. 676.  Dr. Kumar noted that a knee x-ray showed
arthritis for which Dr. Perhala was recommending therapy.  Tr. 676.  Dr. Kumar talked about the
possibility of radiofrequency ablation.  Tr. 676.

On June 1, 2011, Green reported that her pain had flared up significantly with the prior day being a really bad day.  Tr. 674.  Most of her pain was in her low back.  Tr. 674.  She had not yet started therapy for her knees.  Tr. 674.   Standing, bending and activity bothered her.  Tr. 674.  Sitting down was better.  Tr. 674.  On physical examination, Green had tenderness in the bilateral mid-lower lumbar paraspinal muscles with positive facet joint provocative maneuvers.  Tr. 674.  Green had no real pain with hip internal or external rotation.  Tr. 674.  Her gait, coordination and balance were normal.  Tr. 674.  Because facet joint injections had helped in the past, Dr. Kumar recommended that Green proceed with facet joint injections bilaterally at L3-4, L4-5, and L5-S1.  Tr. 674.  Dr. Kumar continued pain medications, indicated that Green would be scheduled for physical therapy for her knees, and that she should continue with her home exercise program.  Tr. 674.  Later that month, Green saw Dr. Kumar and reported that the injections had helped quite a bit.  Tr. 672.  However, she had recently injured herself getting out of a pool when the ladder steps broke.  Tr. 672.  She ended up bruising her leg.  Tr. 672.  She also had pain and numbness in her arm, which was starting to get better.  Tr. 672.  She said that she was having a pretty good day and was moving good.  Tr. 672.  On physical examination, lumbar flexion and extension were almost normal and not too painful.  Tr. 672.  Green appeared stable neurologically.  Tr. 672.  Her mood and affect were normal.  Tr. 672.  Her strength was functional for ambulation.  Tr. 672.  Dr. Kumar recommended that she continue with Percocet and follow up in about five weeks.  Tr. 672.

In August 2011, Green reported that the pain in her low and middle low back had flared up.  Tr. 774.  Dr. Kumar recommended another round of facet joint injections about two weeks out.  Tr. 774.  He recommended that Green continue with Percocet and anti-inflammatories as needed.  Tr. 744.  Dr. Kumar also advised that she should continue with her home exercise

program.  Tr. 774.  Green proceeded with another round of facet joint injections.  Tr. 772.  However, a week after receiving the injections, Green became ill with bronchitis and was coughing a lot so any relief she had gotten from the injections was negated by the coughing and straining.  Tr. 772.

In January 2012, Green saw Dr. Kumar complaining of a lot of back pain on both sides in the mid-back with pain radiating into her hips.  Tr. 770.  She indicated that heat and ice helped and her pain varied.  Tr. 770.  She was taking anti-inflammatories and Percocet usually three times a day.  Tr. 770.  Dr. Kumar noted that Green had had greater than 80% pain relief from the facet joint injections but the pain returned.  Tr. 700.  He found that Green had failed conservative treatment and recommended setting her up for radiofrequency ablation at the L2 through L5 level and he advised her to continue with Percocet and anti-inflammatories.  Tr. 770.  During a February 29, 2012, visit with a nurse practitioner in Dr. Kumar's office, Green indicated that she was not ready to have radiofrequency ablation.  Tr. 846.  She was exploring the possibility of gastric bypass surgery and was hoping that losing weight could alleviate some of her symptoms.  Tr. 846.

On March 28, 2012, Green continued to report pain in her back and knees.  Tr. 844.  Sitting and lying were better for her.  Tr. 844.  On physical examination, Dr. Kumar observed tenderness in Green's lower lumbar paraspinal muscles with mildly positive facet joint provocative maneuvers.  Tr. 844.  There was tenderness in the S1 joints.  Tr. 844.  Sensation was grossly intact to light touch.  Tr. 844.  Strength was functional for ambulation, coordination was normal and balance was fair.  Tr. 844.  Dr. Kumar continued Green on Percocet and discussed pursuing additional injections in the future.  Tr. 844.

On May 16, 2012, Green reported that her pain that was quite significant.  Tr. 879.  Her

pain had flared up because she had been taking care of her mother who had a stroke.  Tr. 879.

Additional facet joint injections were recommended (Tr. 879) and administered later that month

(Tr. 878).

### 2.  Opinion evidence

### ***Treating physicians***

### *Dr. Cole*

On March 8, 2012, Dr. Cole completed a Medical Statement – Physical

Limitations/Mental Abilities form wherein he listed Green's diagnoses as rheumatoid arthritis,

diabetes, asthma, and depression.  Tr. 828.  He opined that physically Green  had the ability to

stand at one time for 15 minutes; sit at one time for 30 minutes; occasionally lift 5 pounds;

occasionally bend; and frequently manipulate with her hands and frequently raise her arms over

shoulder level.  Tr.  828.  He opined that Green could work for no hours during the day; could

not frequently lift any amount of weight; and could never stoop.  Tr. 828.  With respect to mental

limitations, Dr. Cole opined that Green was moderately impaired in her ability to maintain

attention and concentration and that Green suffered markedly from depression, anxiety and panic

disorder.  Tr. 828.  Dr. Cole also opined that Green's impairment(s) and/or treatment would

cause her to be absent from work more than three times per month.  Tr. 829.

### *Dr. Perhala*

On March 15, 2012, Dr. Perhala completed an Arthritis Residual Functional Capacity

Questionnaire.  Tr. 833-835.  Dr. Perhala noted that he started seeing Green in October 2009 for

joint pain.  Tr. 833.  Dr. Perhala's diagnosis was rheumatoid arthritis and he opined that her

prognosis was fair.  Tr. 833.  He identified the following symptoms: pain in multiple joints; back

pain; arm pain; diffuse muscle pain; and fatigue.  Tr. 833.  In describing the nature, location, frequency, precipitating factors, and severity of Green's pain, Dr. Perhala stated that Green had pain in multiple joints "all day, every day."  Tr. 833.  Dr. Perhala identified the following positive objective signs: joints affected (hands, wrists, shoulders, knees, feet, and back); tenderness; abnormal gait; trigger points (per her neurologist for fibromyalgia); swelling; and reduced grip.  Tr. 833.  Dr. Perhala indicated that Green's pain was severe enough to frequently interfere with her attention and concentration and he indicated that depression and anxiety affect her pain.  Tr. 833.  Dr. Perhala opined that Green would be unable to tolerate even "low stress jobs" because of a combination of diffuse joint pain, diffuse muscle pain, and persistent back pain and fatigue.  Tr. 834.

With respect to Green's functional abilities, Dr. Perhala opined that Green could walk less than one city block without rest or severe pain; sit continuously for 45 minutes at a time; stand continuously for 20 minutes at a time; stand/walk less than  2 hours in an 8-hour workday; and sit about 2 hours in an 8-hour workday.  Tr. 834.  Dr. Perhala opined that, during an 8-hour workday, Green would be required to walk every 45 minutes for 10 minutes at a time and she would require a position that allowed shifting positions at will. Tr. 834.  Dr. Perhala opined that Green would be required to take unscheduled breaks in order to sit down during an 8-hour workday every 2-3 hours for 10 minutes.  Tr. 834.  Dr. Perhala opined that Green could occasionally lift/carry less than 10 pounds and never lift 10 pounds or more.  Tr. 835.  Dr. Perhala opined that Green would be limited bilaterally to using her hands (grasp, turn/twist objects) 20% of the time during an 8-hour workday; using her fingers (fine manipulation) 15% of the time during an 8-hour workday; and using her arms (reaching, including overhead) less than 10% of the time during an 8-hour workday.  Tr. 835.  Dr. Perhala opined that Green would be

unable to stoop or crouch.  Tr. 835.  He opined that Green would likely be absent from work as a result of her impairments or treatments more than four times a month.  Tr. 835.

### *State agency reviewing physicians – physical*

On December 22, 2010, state agency reviewing physician W. Bolz reviewed Green's medical records and completed a Physical RFC Assessment.  Tr. 554-561.  He opined that Green could perform light exertional work with no climbing of ladders/ropes/scaffolds; occasional stooping, kneeling, crouching, and crawling; frequent climbing ramps/stairs and balancing; and avoidance of concentrated exposure to extreme cold, wetness, and hazards such as machinery and heights.  Tr. 555-558.

State agency reviewing physician Bernard Stevens, M.D., reviewed the updated record and, on January 17, 2011, affirmed Dr. Bolz's RFC for light work.  Tr. 562.

Also, on June 16, 2011, state agency reviewing physician Myung Cho, M.D., reviewed the record upon reconsideration and affirmed the initial light RFC.  Tr. 614.

### *State agency reviewing psychologists – mental*

On February 3, 2011, state agency reviewing psychologist Darrell Snyder, Ph.D., completed a Psychiatric Review Technique (Tr. 563-574) and opined that Green's depressive condition was not a severe impairment.  Tr. 563, 573.  Dr. Snyder concluded that Green had mild restrictions/difficulties in activities of daily living, social functioning, and concentration, persistence or pace.  Tr. 571.  He also found no episodes of decompensation of an extended duration.  Tr. 571.  On June 15, 2011, state agency reviewing psychologist Aracelis Rivera, Psy.D., affirmed Dr. Snyder's February 3, 2011, mental impairment assessment.  Tr. 613.

**C.**     **Testimonial evidence**

       **1.**     **Plaintiff's testimony**

Green appeared with counsel and testified at the administrative hearing.[7]  Tr.  39-58.

Green explained that she has severe pain in her back with numbness in her arms and legs at

times.  Tr. 40.  She is constantly tired and, although she tries to rest, she is unable to do so.  Tr.

40-41.  Because of her pain, she has to think about her movements before moving.  Tr. 41.   She

takes two muscle relaxers at a time in the morning and at night and she also takes two to three

Percocets each day.  Tr. 41.  With or without pain medication, Green indicated that she is

constantly in pain.  Tr. 41.  Her back has bothered her off and on for a number of years.  Tr. 45.

In the past, she was usually able to work through it herself.  Tr. 45.  Now she is lucky if she can

lift 10 pounds.  Tr. 45.  She indicated that there are times that her back locks up for days.  Tr. 47.

She relies on her husband to help her with her personal care.  Tr. 47.  For example, she does not

get in the bathtub unless her husband is there because she is afraid that she will not be able to get

out.  Tr. 47.

Green has undergone steroid injections for her back pain.  Tr. 53. Although her

physicians have recommended radiofrequency ablation for her pain, she has declined to proceed

with the ablation procedure.  Tr. 52-53.  She reported experiencing some side effects from the

steroid injections and the results of her injections had been hit or miss.  Tr. 53.  She explained

that the ablation procedure would involve lasering her nerves, it may have side-effects and there

is no guarantee it will help.  Tr. 53.   Thus, she feels that ablation is a big risk and has not

proceeded with the procedure.  Tr. 53.

Green explained that her rheumatoid arthritis affects her ability to do things with her

hands.  Tr. 44-45.  She has a hard time opening things.  Tr. 45.  She no longer has the manual

---

[7] During the hearing, Green's counsel informed the ALJ that Green had recently undergone a sleep study, which showed that Green had severe sleep apnea.  Tr. 31-32.  The ALJ provided Green's counsel time to submit those records.  Tr. 32, 62.

dexterity in her fingers to perform any type of tedious task.  Tr. 45.  Sometimes her fingers cramp up. Tr. 45.  She also indicated that her hands lock up a lot.  Tr. 54.  She indicated that she would not be able to work all day using a computer keyboard.  Tr. 55.  She said the day before her hearing one of her arms was numb all day.  Tr. 55.  Both arms were numb the morning of the hearing but by the time she got to the hearing she had more feeling in her arms.  Tr. 55.

Because of her fibromyalgia, everything hurts all the time.  Tr. 46.  Her bones, skin and muscles hurt.  Tr. 46.  During the prior summer, Green lost the use of her arms due to a virus. Tr. 46.  She was unable to pick things up and could not write.  Tr. 46.  She was diagnosed with brachial plexopathy.  Tr. 46.

Green has also been diagnosed with Raynaud's disease, which she explained causes her circulation problems.  Tr. 56.  A lot of times, her feet and hands are ice cold and, because of the loss of feeling in her extremities, she has to be careful not to burn herself.  Tr. 56-58.

Green indicated that she is usually up four times throughout the night. Tr. 42.  If she moves a little during the night, it is a little easier for her in the morning.  Tr. 42.  When she wakes in the morning, she tries to do some stretching in bed to get her joints ready to move.  Tr. 42.  She has to do about a half hour of stretching before her joints are loosened and she gets out of bed.  Tr. 42.  When she does get out of bed, she dresses herself in clothes that are simple and easy for her to put on.  Tr. 42.  If she has to put socks and shoes on, her 10 year old granddaughter usually assists her. Tr. 42.  Once she gets moving, she takes her muscle relaxers and a pain pill and tries to make herself something to eat.  Tr. 42. She then tries to get something started for dinner in the crock-pot.[8]  Tr. 42.  If she has not started a crock-pot meal for dinner, they usually pick something up to eat for dinner because her energy level is gone by mid-

---

[8] She indicated that she loves to cook and bake but has not been able to do much of that because she cannot handle the standing.  Tr. 42.

afternoon.  Tr. 42.  She then lies down for a two to three-hour nap.  Tr. 42-43.  Her daughter and husband do most of the housework.  Tr. 43.  After napping, she might talk or play a game with the kids.  Tr. 43.  If she does go grocery shopping, she has someone help her load/unload the groceries for her.  Tr. 43.  She tries to walk rather than use a scooter when shopping.  Tr. 51. She feels she has to try to walk to the extent she can because "you have to use it or lose it."  Tr. 51.  She noted, however, that she had recently taken the kids to the zoo and rented a scooter because she would not have been able to handle the walking.  Tr.  51.  Green is able to drive but, because she is tired a lot, she tries to watch how much she drives and does not drive long distances.  Tr. 44.

When asked how long she can sit before feeling uncomfortable, Green indicated that she had been uncomfortable since she sat down for the hearing.  Tr. 47.  She can stand for about 10 to 15 minutes before having to sit.  Tr. 47.  She has to rest for about 3 to 5 minutes and then she can stand for about another 10 minutes.  Tr. 47.  She has to be able to stop and sit down when going places.  Tr. 47.  Her husband has suggested that she get a rolling walker.  Tr. 47.  She stated that she might eventually have to do that because there is not always somewhere for her to stop and sit.  Tr. 47-48.

Green used to walk regularly for exercise but indicated that she had not walked regularly for over a year.  Tr. 52.  She agreed with the ALJ that the records reflected that she had been to a campground in the fall of the prior year and walked some at that time.  Tr. 52.  She explained that there is an area at the campground, which is not very far, that she was able to walk.  Tr. 52. She noted that the campground season starts in April and ends in October.  Tr. 52.  She stated that they had probably only been to the campground four times that year because it is too much

for her.  Tr. 52.  She explained that it is about a 45-minute drive and it is too much work to get

things situated at the campground once they arrive there.  Tr. 52.

Green indicated that her depression is related to the fact that she is unable to do the things

that she used to be able to do.  Tr. 53.  It has been very difficult for her to deal with and admit

that she has limits.  Tr. 53-54.  She takes Celexa for her depression.[9]  Tr. 55.  She thinks that the

Celexa helps some with her depression.  Tr. 55-56.  She is not as teary-eyed as she used to be.

Tr. 56.

### 2.    Vocational expert's testimony

Vocational expert Mark Anderson ("VE") testified at the hearing.  Tr. 58-61.  The VE

described Green's licensed practical nurse job as a medium level, skilled (SVP 6)[10] job that

Green performed at the heavy level.  Tr. 58.  The VE indicated that, based on Green's past work

as a licensed practical nurse, she had developed some transferrable skills at both the light and

sedentary levels of work such as (1) phlebotomist, a light level, semi-skilled (SVP 3) job with an

estimated 192,000 jobs available in the nation, 9,300 in the state and 2,500 in the region; (2) first

aid technician/attendant, a light level, semi-skilled (SVP 3) job with an estimated 173,000 jobs in

the nation, 5,000 in the state, and 2,000 in the region; and (3) cardiac monitor tech, a sedentary

level, skilled (SVP 5) job with an estimated 40,000 jobs in the nation, 1,500 in the state, and 500

in the region.  Tr. 58-59. The VE described Green's home attendant work job as a medium level,

semi-skilled (SVP 3) job.  Tr. 59.  The VE indicated that Green had no transferable skills from

her home attendant job.  Tr. 59.

---

[9] She noted that Celexa can sometimes also be used to treat fibromyalgia but she was on Celexa prior to her fibromyalgia.  Tr. 55.

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

The ALJ then asked the VE to assume a hypothetical individual of Green's age, education and work experience with the following limitations: limited to the full range of sedentary exertional work; limited to frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; limited to frequent bilateral handling and fingering; must avoid concentrated exposure to extreme cold, concentrated exposure to wetness, concentrated exposure to hazards such as operational control of moving machinery and unprotected heights.  Tr. 59-60.  The VE indicated that the described individual would be unable to perform Green's past work.  Tr. 60.  The VE indicated that, of the three jobs listed based on Green's transferable skills, the described individual would be able to perform the cardiac monitor tech job.  Tr. 60.  The other two jobs would be exertionally precluded.  Tr. 60.

The ALJ then asked the VE to assume the individual described in the first hypothetical but with the additional limitation of being off task about 20% of the work period.  Tr. 60.  The VE indicated that such an individual would be unable to perform Green's past work and there would be no other jobs in the national economy.  Tr. 60-61.  The VE added that, for the cardiac monitor tech job, the individual would be monitoring individuals in the ICU.  Tr. 61.  Although cardiac monitor techs rotate out every 30 to 45 minutes, the VE indicated that, when at their workstation, cardiac monitor techs are required to be on task 100% of the time.  Tr. 61.  Thus, even if someone was off-task just 5% of the work period, the individual would be unable to perform the cardiac monitor tech position.  Tr. 61.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[11] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[11] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

20 C.F.R. §§ 404.1520, 416.920;[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his August 21, 2012, decision, the ALJ made the following findings:[13]

1.  Green met the insured status requirements through December 31, 2015. Tr. 12.

2.  Green had not engaged in substantial gainful activity since December 1, 2009, the alleged onset date.  Tr. 12.

3.  Green had the following severe impairments: rheumatoid arthritis, osteoarthritis, fibromyalgia, degenerative disc disease, Raynaud's disease, status-post carpal tunnel syndrome release, sleep apnea and obesity.  Tr. 12.  Green's depression was a non-severe impairment.  Tr. 12-14.

4.  Green did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14-15.

5.  Green had the RFC to perform sedentary work except she could frequently climb ramps and stairs, but could not climb ladders, ropes or scaffolds; could occasionally balance, stoop, kneel, crouch and crawl; was limited to frequent bilateral handling and fingering; should avoid concentrated exposure to extreme cold, wetness and hazards, such as operational control of moving machinery and unprotected heights.  Tr. 15-19.

6.  Green was unable to perform any past relevant work.  Tr. 19.

---

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[13] The ALJ's findings are summarized herein.

7.     Green was born in 1960 and was 49 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.  Tr. 19.  Green subsequently changed age category to closely approaching advanced age.  Tr. 19.

8.     Green had at least a high school education and was able to communicate in English.  Tr. 19.

9.     Green acquired work skills from past relevant work as a licensed practical nurse, which was skilled with a SVP of 6 and required the following skills: medical knowledge.  Tr. 19.

10.   Considering Green's age, education, work experience, and RFC, Green acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy: namely, a cardiac monitor technician. Tr. 19-20.

Based on the foregoing, the ALJ determined that Green was not disabled.  Tr. 20.

## V. Parties' Arguments

Green argues that the ALJ failed to comply with the requirements of the treating physician rule when evaluating and assigning "little weight" to opinions rendered by two of her treating physicians – Dr. Cole and Dr. Perhala.  Doc. 18, pp. 10-15.  She contends that, prior to assigning "little weight" to the two opinions, the ALJ failed to explain why the opinions were not entitled to controlling weight.  Doc. 18, pp. 12-13.  Further, she argues that the ALJ's assignment of "little weight" to her treating physicians' opinions is not supported by substantial evidence.  Doc. 18, p. 13.  Also, she argues that the ALJ only addressed limited portions of the physicians' opinions and therefore failed to provide sufficient analysis to allow for review and failed to provide "good reasons" for the weight provided.  Doc. 18, pp. 13-14.   Green also argues that the ALJ's RFC and decision that she is able to perform work as a cardiac monitor technician is not supported by substantial evidence because the evidence demonstrated that Green would not be

able to perform a job requiring 100% attentiveness[14] and the VE testified that the cardiac
monitor technician job did not allow for any amount of off-task time.  Doc. 18, pp. 15-16.

In response, the Commissioner argues that, although the ALJ did not specifically state
that he was not providing controlling weight to the opinions of Dr. Cole and Dr. Perhala, it is
clear from the opinion that the ALJ did not assign controlling weight to those opinion because he
assigned "little weight" to them.  Doc. 21, pp. 14-17.  Further, the Commissioner argues that the
ALJ's reasons for providing "little weight" to the opinions of Green's treating physicians were
"good reasons" and those reasons were explained and supported by substantial evidence.  Doc.
21, pp. 14-17.   The Commissioner also argues that the ALJ's finding that Green could perform
work as a cardiac monitor technician is supported by substantial evidence because the ALJ found
Green's statements regarding the severity of her symptoms not fully credible and, since the ALJ
gave only "little weight" to the opinions of Dr. Cole and Dr. Perhala, the ALJ was not required to
credit the limitations contained in those opinions.  Doc. 21, pp. 17-18.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination
that the Commissioner has failed to apply the correct legal standards or has made findings of fact
unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321
F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less
than a preponderance and is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

---

[14] For example, Green argues that the evidence shows that she has episodes of dizziness, mental fog, fatigue,
headaches, pain that requires her to shift positions, moderate difficulties with attention and concentration due to her
severe pain, and she would need to take unscheduled breaks throughout the day.  Doc. 18, p. 15 (relying in part on
the opinions of Dr. Cole and Dr. Perhala).

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A.   The ALJ failed to satisfy the treating physician rule when evaluating the opinion evidence offered by two of Green's treating physicians, Dr. Cole and Dr. Perhala

Green argues that the ALJ failed to meet the requirements of the treating physician rule because the ALJ failed to clearly assess whether the opinions of Dr. Cole[15] and Dr. Perhala[16] were entitled to controlling weight.  Doc. 18, pp.  10-15.   Additionally, Green argues that the ALJ did not consider the entirety of the opinions and failed to provide "good reasons" for providing only "little weight" to the opinions of her treating physicians.  Doc. 18, pp. 10-15.

The Commissioner responds that the ALJ's decision makes clear that he considered Dr. Cole's and Dr. Perhala's opinions and that the ALJ provided good reasons for providing "little weight" to those opinions , which are supported by substantial evidence.  Doc. 21, pp. 14-17.

---

[15] Dr. Cole was one of Green's primary care physicians.

[16] Dr. Perhala was the physician who primarily treated Green for her rheumatoid arthritis.

Since Dr. Cole and Dr. Perhala were treating physicians,[17] the ALJ was required to

adhere to the treating physician rule when evaluating their opinions.  Under the treating

physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds

the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques

and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of

Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365,

376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine

what weight should be given to the treating source's opinion, and the Commissioner's

regulations also impose a clear duty on an ALJ always to give good reasons in the notice of

determination or decision for the weight given to treating source opinions.[18]  *Cole v. Comm'r of

Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v.

Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).  "Those good reasons must be supported

by the evidence in the case record, and must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996

SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This

requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t

is intended 'to let claimants understand the disposition of their cases, particularly in situations

where a claimant knows that his physician has deemed him disabled and therefore might be

---

[17] The Commissioner does not contend that Dr. Cole and Dr. Perhala were not treating physicians.

[18] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c).

especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).

Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 20)09) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits.  *Wilson*, 378 F.3d at 546-547.

> With respect to Dr. Cole and Dr. Perhala, the ALJ stated:
>
> Richard Cole, M.D., one of the claimant's physicians, opined the claimant had marked depression and would miss more than three times per month due to her impairments (Ex. 36F).  This opinion is given little weight as it is not supported by a majority of the objective medical evidence or Dr. Cole's own treatment notes.
>
> Robert S. Perhala, M.D., one of the claimant's physicians, opined the claimant could only sit for two hours in an eight-hour workday, and opined the claimant would miss work four times per month due to her impairments (Ex. 37F).  This opinion is given little weight as it is not supported by a majority of the objective medical evidence or Dr. Perhala's own treatment notes.

Tr. 18-19.

Even though the foregoing demonstrates that the ALJ discussed and assigned weight to opinions rendered by Dr. Cole and Dr. Perhala, the ALJ only referenced and appears to have only weighed limited portions of those opinions.  The Commissioner does not directly address

the ALJ's failure to discuss or weigh the entirety of the treating physicians' opinions.  Rather, the Commissioner argues "[t]his is not a situation where the ALJ failed to mention the treating sources altogether or overlooked a treating source opinion."  Doc. 21, p. 14.

Although the ALJ did not fail to mention and/or may in fact have reviewed the entirety of their opinions, the ALJ did not clearly articulate reasons for discounting or dismissing large portions of the treating physicians' opinions.  For example, Dr. Cole also opined that Green was moderately impaired in her ability to maintain attention and concentration.  Tr. 828. Additionally, Dr. Cole also included his opinion regarding Green's physical limitations, including his opinion that Green would be limited to standing for 15 minutes at a time and sitting for 30 minutes at a time.  Tr. 828-830.  Similarly, Dr. Perhala's opinion was more in depth than acknowledged or discussed by the ALJ.  Tr. 833-836.  For example, Dr. Perhala did not only opine that Green could only sit for two hours a day or would miss work more than four times per month.  Dr. Perhala also opined that Green would be unable to sit for more than 45 minutes at a time; would be unable to stand for more than 20 minutes at a time; would require the ability to shift positions at will; would require unscheduled breaks; would be unable to stoop or crouch. Tr. 833-835.  Dr. Perhala also indicated that Green's pain would interfere with her attention and concentration.  Tr. 833.

The opinions of Dr. Cole and Dr. Perhala that were not discussed or even mentioned by the ALJ are inconsistent with the ALJ's RFC assessments and/or were not taken into account in the RFC.  For example, although both physicians opined that Green would have impairments in attention and concentration, the RFC contains no limitation related to attention and concentration.  Tr. 15.  The ALJ discussed and assigned significant weight to the opinions of the state agency reviewing psychologists who opined that Green had mild limitations in social

functioning and in maintaining concentration, persistence or pace but did not have a severe

mental impairment.  Tr. 18.  That discussion, however, is not sufficient to demonstrate that the

ALJ's failure to clearly consider and weigh the entirety of the treating source opinions was

harmless, especially in light of the VE's testimony that limitations in attention and concentration

could preclude Green from performing the cardiac monitor tech job.  Tr. 61.

Here, the ALJ clearly did not discuss the entirety of the opinion evidence.  He chose to

highlight only certain portions of each of the treating physicians' opinions and, thus, it appears

that the ALJ weighed only those select portions.   The ALJ's lack of articulation leaves this

Court to speculate as to what amount of weight, if any, the ALJ assigned to other portions of Dr.

Cole's and Dr. Perhala's opinions not discussed by the ALJ.

Additionally, the ALJ's reasoning with respect to the weight that was assigned was

cursory in nature.  Further, although Dr. Cole's and Dr. Perhala's opinions appear to be

somewhat consistent with one another, the ALJ does not acknowledge this consistency or discuss

why, notwithstanding some consistency between the two treating physician opinions, only "little

weight" was warranted.  20 C.F.R. § 404.1527(c)(4) (one of the factors to consider when

weighing opinion evidence is consistency).

The Commissioner argues that the ALJ discussed the medical evidence as a whole and

that that discussion was sufficient to demonstrate that the ALJ's reasons for providing "little

weight" were "good reasons."  Doc. 21, pp. 15-17.   However, considering Green's multitude of

impairments, the ongoing treatment relationship Green had with both Dr. Cole and Dr. Perhala,

and that there is some consistency between the two treating physicians' opinions, the ALJ's

failure to provide a more complete discussion and analysis of the treating physicians' opinions

leaves this Court unable to conclude that the ALJ sufficiently complied with the treating

physician rule.  *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.   Moreover, "[a]n ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'"  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)*.*  Thus, reversal and remand is warranted to ensure compliance with the treating physician rule.

**B.     Other issue**

Green also challenges the ALJ's Step Five finding that she would be able to perform the work of a cardiac monitor technician.  Her argument is based in part upon her treating physicians' opinions regarding the need for unscheduled breaks, difficulty with attention and concentration due to pain, and the need to shift positions.  Doc. 18, p. 15.  Because remand is warranted for further evaluation of the treating physician opinions, this Opinion does not address Green's additional argument regarding the Step Five finding.  *See Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

**VII. Conclusion**

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this Opinion.[19]

Dated:  March 2, 2015

Kathleen B. Burke
United States Magistrate Judge

---

[19] This opinion should not be construed as requiring a determination on remand that Green is disabled.